NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0355n.06

Case No. 15-4127

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 29, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| 4218868 CANADA, INC., dba Pivotal Holdings, Ltd., | ) | |
| | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| BARRY KWASNY, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | O P I N I O N |

BEFORE: SUHRHEINRICH, McKEAGUE, and DONALD, Circuit Judges.

McKEAGUE, Circuit Judge. This action stems from an employment relationship involving plaintiff 4218868 Canada, Inc., d/b/a Pivotal Holdings, Ltd., a Canadian corporation ("Pivotal Holdings"), and defendant Barry Kwasny, a citizen of Ohio. Kwasny was originally employed in 2003 by Pivotal Holdings' affiliate, now known as Pivotal Payments, Inc., as Director of Sales Operations. He was soon promoted to Vice President of Client Care, a capacity in which he served for almost ten years, until his termination on February 19, 2014. The instant dispute concerns whether Kwasny, as part of his severance package, is entitled to the value of options to purchase company stock he had been granted during his employment but which he failed to exercise prior to termination.

The district court awarded summary judgment, granting Pivotal Holdings' claim for declaratory judgment and denying Kwasny's. The court concluded that the Options Grant unambiguously created a condition precedent that was never fulfilled, rendering the promised stock options unenforceable. We hold that the Options Grant is not unambiguous and that extrinsic evidence must be considered to determine the parties' intent. We therefore vacate the summary judgment ruling and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are fairly summarized in the district court's opinion as follows:

> Plaintiff 4218868 Canada, also known as Pivotal Holdings, Ltd., is the holding company of Kwasny's former employer, Pivotal Payments, Inc. ("PPI"). Kwasny, an Ohio resident at the time, was originally hired in July 2003 as the Company's Director of Sales Operations. On May 3, 2004, Kwasny accepted a promotion to serve as PPI's Vice President of Client Care, working in Montreal, Quebec on a regular basis.

> On September 30, 2004, five months after starting the new position, Kwasny received a signed document from the President and CEO of 4218868 Canada, Philip Fayer, reading:

> > 4218868 Canada Inc. ("4218868") is pleased to provide you with a grant of options representing 1% of the fully diluted value of 4218868 *subject to the execution of a definitive options agreement outlining the terms and conditions under which such options may be exercised*. The options will have an exercise value of $0.01 per share. 4218868 owns 100% of the issued and outstanding common shares of Pivotal Payments Corporation and Payment Systems Merchant Services, Inc.

> Kwasny worked in this role until February 19, 2014, when his position was eliminated and he was terminated. On that same day, as part of the termination, Plaintiff offered Kwasny a severance package, which would require Kwasny to sign a detailed Severance Letter of Agreement, including a release of "all claims to any ownership interest in the Company, contractual or otherwise, including but not limited to claims to stock or stock options."

On February 25, 2014, Kwasny's attorney sent a letter to 4218868 Canada, stating that he wanted to initiate a discussion on Kwasny's behalf regarding the options 4218868 Canada granted to Kwasny and Kwasny's employment termination. On March 3, 2014, Kwasny's attorney sent an e-mail to 4218868 Canada stating that Kwasny was "unable to execute any termination agreement without addressing the exercise of options granted to him by Mr. Philip Fayer on September 30, 2004." On March 7, 2014, counsel for 4218868 Canada replied, stating that no definitive options agreement had been "discussed or prepared, much less executed, by the parties[,]" and thus, "[i]n light of the lack of a definitive options agreement and the failure of the Options Grant to specify necessary essential terms for any such grant, there is plainly no valid or enforceable agreement regarding a grant of options in Pivotal."

Plaintiff filed a Complaint for Declaratory Relief on March 17, 2014, asking the court to declare "that no valid or enforceable contract was ever formed regarding a grant of options to Kwasny, and that Kwasny is not entitled to purchase any interest in Pivotal Holdings or any affiliate of Pivotal Holdings." On May 8, 2014, Kwasny filed his Answer and Counterclaim, requesting the court to hold that "Kwasny has an enforceable agreement and is entitled to purchase 1% of the fully diluted value of 4218868 Canada, Inc. for $.0.01 per share," and asserting state claims for breach of contract, promissory estoppel, and fraud.

Plaintiff filed its Motion on June 10, 2014, seeking summary judgment on both its own Complaint for Declaratory Relief and Kwasny's Counterclaim. On August 12, 2014, Kwasny filed his Motion for Summary Judgment Regarding Count IV of his Counterclaim for Declaratory Relief.

R. 35, Order at 1–3, Page ID 521–23 (emphasis added; citations omitted).

The district court stayed discovery for a year before granting plaintiff 4218868 Canada's motion for summary judgment and denying Kwasny's. In essence, the court held the Options Grant was unambiguous and the "subject to" language created a condition precedent under Ohio law. The court therefore refused to consult extrinsic evidence of the parties' intent. Because the unambiguous condition precedent required execution of a definitive options agreement and no such agreement was executed before Kwasny was terminated, the court concluded that the

Options Grant never became a binding and enforceable obligation. The court awarded judgment in favor of 4218868 Canada on its claim for declaratory relief and on all of Kwasny's counterclaims.

The issues raised in Kwasny's appeal are limited to the reciprocal declaratory judgment claims.[1] Kwasny contends the language of the Options Grant is subject to two reasonable interpretations and is therefore ambiguous. Contending the ambiguity should be construed against the drafter, Kwasny argues the judgment should be reversed and he should be awarded a declaratory judgment that the Options Grant is enforceable.

## II. ANALYSIS

### A. Standard of Review

We review the summary judgment ruling de novo. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Under Rule 56, summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Smith*, 708 F.3d at 825. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Id.* A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment. *Sierra Club v. ICG Hazard*, 781 F.3d 281, 284 (6th Cir. 2015). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the

---

[1]The court's ruling on Kwasny's breach of contract, promissory estoppel, and fraud claims is not part of this appeal and those claims are given no further consideration.

governing substantive law—in this case, Ohio law. *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

Questions of contract interpretation that form the basis for a summary judgment ruling are likewise subject to de novo review. *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008). The role of the court is to ascertain and give effect to the intent of the parties, as shown by the plain language of the contract. *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 844 (6th Cir. 2013). If a contract is clear and unambiguous, there is no issue of fact to be determined and the court should give effect to the plain language without resort to extrinsic evidence. *Royal Ins.*, 525 F.3d at 421. Whether language is ambiguous, i.e., susceptible to two or more reasonable interpretations, is a question of law. *Id.* This determination is made with reference to the contract as a whole, giving contract language its ordinary and natural meaning. *Id*.

If contract language is ambiguous, then extrinsic evidence may be consulted to aid in interpretation. *Id.* at 422. Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objective the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement. *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 41 N.E.3d 145, 153 (Ohio Ct. App. 2d Dist. 2015). But the court may not use extrinsic evidence to create an ambiguity. *Id.*; *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). The ambiguity warranting resort to extrinsic evidence to determine the parties' intent must be apparent on the face of the document. *PNC Bank*, 41 N.E.3d at 153. If the extrinsic evidence creates a genuine fact dispute, the parties' intent is for the trier of fact to resolve. *Royal Ins.*, 525 F.3d at 422.

Kwasny argues that the Options Grant language *is* ambiguous, but that the extrinsic evidence creates no genuine dispute as to the parties' intent and the court should therefore resolve the ambiguity against the drafter, 4218868 Canada. Indeed, where a construing court must choose between two reasonable interpretations, per the rule of *contra proferentem*, the court should choose the construction that operates against the drafter. *Savedoff*, 524 F.3d at 764. However, this rule of construction comes into play only if the extrinsic evidence fails to show the parties' intent. *Cline v. Rose*, 645 N.E.2d 806, 809 (Ohio Ct. App. 3d Dist. 1994) (noting that where parol evidence makes meaning of contract clear, secondary rule of strict construction against drafter is not applicable); *Raphael v. Flage*, 1989 WL 109122 at *2 (Ohio Ct. App. 9th Dist.) (same).

## B. "Subject to" as Condition Precedent?

Kwasny first argues that the district court misapplied Ohio contract law when it held the "subject to" language in the Options Grant unambiguously created a condition precedent. The district court acknowledged the term could be defined as meaning "contingent on" or "under the influence of" some later action. R. 35, Order at 7, Page ID 527. That is, the court acknowledged that "subject to," as the term appears in the Options Grant, could be plausibly given one of two different constructions. In choosing the former of these two definitions, the court cited *Purdin v. Hitchcock*, 1993 WL 19508 (Ohio Ct. App. 4th Dist.). In *Purdin*, the court observed that "subject to" generally means "contingent or conditional upon." *Id.* at *4. In the contract context, the *Purdin* court noted that "subject to" usually signifies intent to create a particular kind of condition, a condition precedent. *Id.* "A condition precedent is a condition which must be performed before the agreement becomes effective; it calls for the happening of some event, or

the performance of some act, after the terms of the contract have been agreed upon, before the contract will be binding on the parties." *Id.*

Yet, the *Purdin* court also acknowledged that "[w]hether a provision in an agreement is a condition precedent is a question of intent, and intent is ascertained by considering not only the language of a particular provision but also the language of the entire agreement and its subject matter." *Id.* That is, the parties' intent determines whether a contractual provision is, on the one hand, a condition precedent, such that the duty of performance does not arise *until* the specified condition occurs; or, on the other hand, a promise *presently* giving rise to a duty to perform, the performance of which is subject to the influence of the specified condition when it occurs. *See Campbell v. George J. Igle & Co., Inc.*, 3 N.E.3d 219, 223 (Ohio Ct. App. 4th Dist. 2013); *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 965 N.E.2d 1007, 1013 (Ohio Ct. App. 10th Dist. 2011); *Adkins v. Bratcher*, 2009 WL 44822 at *6 (Ohio Ct. App. 4th Dist.). Under Ohio law, "[c]onditions precedent are not favored by the law, and whenever possible courts will avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary." *Campbell*, 3 N.E.3d at 223 (quoting *Adkins*, 2009 WL 44822 at * 6); *see also Evans*, 965 N.E.2d at 1013–14; *Marine Max of Ohio, Inc. v. Moore*, 2016 WL 3032748 at *4 (Ohio Ct. App. 6th Dist.). Conditions precedent are disfavored because the courts prefer to avoid forfeiture and unjust enrichment, but ultimately the parties' intent controls. *Evans*, 965 N.E.2d at 1014; Restatement (Second) of Contracts § 227, Cmt. b (1981).

In holding that the Options Grant unambiguously constituted a promise to perform in the future *if* the condition precedent is met, rather than a present promise to perform *when* the condition is met, the district court relied on the "usual" meaning of "subject to" in the contract context. However, the court did not refer to the entire employment agreement or its subject

matter in attempting to determine the parties' intent. Nor did the court give any reason for rejecting the "under the influence of" definition of "subject to" that would have rendered the Options Grant a promise to perform a presently arising duty. In relying on the *Purdin* observation that "subject to" are "usual words" for creating a condition precedent in the contract context, the court relied on a presumption in favor of the "usual," a presumption at odds with Ohio law's preference for avoiding construction of provisions as conditions precedent unless the parties plainly so intended. Kwasny thus correctly contends that the district court neglected to examine the parties' intent and ignored the preference under Ohio law for *not* construing conditions as conditions precedent. The district court's reasoning is thus flawed as a matter of law.

Yet, we may affirm the award of summary judgment on any grounds supported by the record, even if different from the district court's grounds. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Even though the district court's analysis is lacking, we may uphold the decision if the result is otherwise correct. We therefore consider the language of the parties' agreement as a whole and its subject matter to determine what they disclose about the parties' intent.

### C. Agreement as a Whole

The Options Grant language quoted above represents the entirety of the Options Grant document, addressed to Barry Kwasny from President and CEO Philip Fayer. But the Options Grant is not the entirety of the parties' contractual agreement. No one is suggesting that Pivotal Holdings intended to make a gift to Kwasny. The Options Grant did not arise in a vacuum; it is part of an overarching employment relationship that spanned some eleven years. By way of background, Kwasny contends, supported by his affidavit, that the Options Grant was an element of increased compensation to induce him to stay on as Vice President in September 2004 even

though his duties imposed hardship, requiring him to spend approximately half the year in Montreal, away from family. Kwasny contends he accepted the Options Grant and continued to work as Vice President "because of the potential financial gain created by the 'Options Grant' if I could assist in turning around the 4218868 Canada Inc.'s business and help it prosper." R. 26-1, Kwasny Aff. at ¶ 14, Page ID 299.

Pivotal Holdings has not directly rebutted these assertions, but points out that Kwasny had accepted promotion to the Vice President position in May 2004, over four months prior to the Options Grant letter. Still, the correspondence initially memorializing the promotion is consistent with Kwasny's explanation. Dated May 6, 2004, the letter from Fayer to Kwasny provides in relevant part:

> Your remuneration will remain unchanged at the present time. However, we will review your remuneration in three months, and any adjustment will be retroactive to the effective date of this promotion.

R. 20-5, New Position Letter, Page ID 121. Thus, the timing of the Options Grant was roughly consistent with Fayer's earlier assurance that Kwasny's remuneration would be re-evaluated in three months. The timing is also consistent with Fayer's declaration, explaining that Kwasny's promotion "came with an annual salary increase of $30,000 within four months, from $85,000 to $115,000." R. 30-3, Fayer Dec. at ¶ 3, Page ID 452.

But even if it is undisputed that the Options Grant represented part of Kwasny's compensation package as he continued performing the duties of a new position that required him to frequently work in Montreal, this background information does not indicate whether the parties intended the "subject to" language to create a condition precedent. It does not help determine whether the anticipated "definitive options agreement outlining the terms and conditions" represented a condition precedent or simply a mutual acknowledgement that the

grant of the options would be executed under the influence of terms yet to be defined. The fundamental question remains unanswered; the ambiguity in the language of the Options Grant is not resolved by reference to the language and subject matter of the employment agreement as a whole. It follows that extrinsic evidence may be consulted to aid in interpretation. *See Royal Ins.*, 525 F.3d at 422.

## C. Extrinsic Evidence

Relevant extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objective the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate their interpretation of the agreement. *PNC Bank.*, 41 N.E.3d at 153. Although Fayer filed a declaration and Kwasny filed an affidavit, neither statement of the only two persons who were privy to the Options Grant sheds much light on the precise meaning of "subject to." As indicated above, there is no dispute that the Options Grant was part of Kwasny's compensation package, in consideration of which he continued working as Vice President for almost ten years. Nor is there any dispute about the fact that, after the Options Grant was given to Kwasny in September 2004, Fayer and Kwasny had no further discussion about executing "a definitive options agreement outlining the terms and conditions under which such options may be exercised" until after Kwasny's termination. But neither Fayer nor Kwasny has stated specifically how he understood the "subject to" language or whether they reached a meeting of the minds on its meaning. The statements they have given suggest diametrically opposed understandings.

Fayer's declaration contains the following paragraph:

> With regard to Mr. Kwasny's claim that he was granted options to purchase stock in Plaintiff, among the terms and conditions I never discussed with him are when such options would vest, when they had to be exercised, whether some event might occur by which he would forfeit the options despite their being

> vested, whether some or all of the options would be effective after his termination for cause and, if so, for what period of time. This is among the reasons why my correspondence to Mr. Kwasny of September 30, 2004 made the creation of a binding options contract *contingent upon the execution of* a definitive options agreement outlining the terms and conditions under which such options could be exercised. These are also standard terms contained in options agreements.

R.30-3, Fayer Dec. ¶ 4, Page ID 452–53 (emphasis added). Not unexpectedly, Fayer professes belief that the "subject to" language created a condition precedent. His declaration also acknowledges, however, that the several identified "terms and conditions" not discussed by him and Kwasny are "standard terms" that would have been included in the definitive options agreement. He says he understood that until those terms were supplied, no "binding" options contract was created. But Fayer's declaration offers no support for the notion that this understanding was discussed or agreed to by Kwasny. Nor does Fayer offer any explanation for the lack of further discussion about the definitive terms.

Kwasny's affidavit is no more conclusive and no less self-serving. He acknowledges that the parties never entered into a definitive options agreement. Yet, he avers that his rights under the "Options Grant vested at the time I received it and did not have any future contingencies." R. 26-1, Kwasny Aff. at ¶ 12, Page ID 298. Kwasny says he relied on the Options Grant as part of the compensation package that induced him to remain as Vice President for ten years, during which time, the "business and earnings grew substantially" and "I played a role in said successes." *Id.* at ¶ 14, Page ID 299. Though no time limit had been placed on his ability to exercise his rights options, when he attempted to do so after he was discharged, on February 25 and March 3, 2014, his request was denied. *Id.* at ¶¶ 19–21, Page ID 299–300. Kwasny offers no explanation for his delay in exercising the options until after he was discharged. Nor does the

record indicate whether Kwasny had advance notice of his impending discharge, such that he had a knowing opportunity to exercise the options before it was "too late."

As summarized above, the extant record leaves genuine fact questions regarding the lynchpin issue, the parties' intent. Because the district court stayed discovery after the motions for summary judgment were filed, the factual record is truncated. Neither Fayer nor Kwasny was deposed; neither of their respective different understandings of the Options Grant language was subject to testing in cross-examination. Nor does the record reveal much about the "standard terms" referred to by Fayer that would have been included in the definitive options agreement. The Options Grant itself does include several essential terms and defines them specifically. Kwasny was given the option to purchase up to 1% of the fully diluted value of 4218868 Canada shares at an exercise value of $0.01 per share. But the Options Grant left open such terms as whether and when the options vested, as well as the exercise period.

Yet, the only ruling before us now is the premature conclusion that the Options Grant created a condition precedent. The ruling is premature because "subject to" is ambiguous and the under-developed factual record leaves material questions regarding the parties' intent unanswered and ostensibly disputed. The extrinsic evidence presently available includes Fayer's acknowledgement that the missing terms are commonly supplied as "standard terms." Additional discovery or trial proceedings could yield evidence supporting a reasonable jury finding that the Options Grant did not create a condition precedent, but a simple promise to perform. Additional proceedings could yield evidence supporting a finding that the "standard terms" under which Pivotal Holdings has allowed other employees to exercise options include, for instance, the right to exercise the options up to 30 days *after* termination. The Options Grant could thus conceivably be deemed to memorialize an enforceable obligation.

Given that conditions precedent are disfavored by the law and contract provisions will be construed as conditions precedent only if the parties plainly so intend; and given that "subject to" is ambiguous; and given that the available extrinsic evidence does not resolve the ambiguity, we conclude the parties' intent must be developed in further proceedings and eventually determined by the trier of fact. *Royal Ins.*, 525 F.3d at 422.[2] The district court's summary judgment ruling must therefore be vacated and the case remanded for further proceedings.

### D. Instructive Case Law

The parties' briefing focuses on three unpublished decisions they contend are instructive. The reasoning used in these cases confirms the appropriateness of the above result. First, Pivotal Holdings cites *Bisbee v. Grogan*, 1992 WL 158935 (Ohio Ct. App. 6th Dist.), for the proposition that the Options Grant is too indefinite to be an enforceable contract. *Bisbee* is materially distinguishable. Here, because discovery was stayed before completion, the factual record needed to determine whether, in the mutual contemplation of the parties, the Options Grant constitutes an enforceable promise rather than a contingent promise, is incomplete.

Pivotal Holdings's reliance on *Imbrogno v. MIMRx.COM, Inc.*, 2003 WL 22707792 (Ohio Ct. App. 10th Dist.), is similarly unavailing. In *Imbrogno*, the asserted contract was deemed illusory for lack of sufficiently definite essential terms. *Imbrogno* is distinguishable in that the terms set forth in the instant Options Grant, albeit incomplete, are much more definite than the general, open-ended representation made in *Imbrogno*. And further development of the record in discovery could supply the facts needed to render the contract enforceable.

---

[2]Because the factual record is not complete, we cannot say that further discovery will not uncover additional extrinsic evidence indicating the parties' intent. The rule of *contra proferentem* cannot therefore be invoked to resolve the ambiguity at this stage. *See Cline*, 645 N.E.2d at 809.

- 13 -

Finally, the parties take conflicting positions on the significance of *McGonagle v. Somerset Gas Transmission Co.*, 2011 WL 5353089 (Ohio Ct. App. 10th Dist.). The *McGonagle* court reversed as premature the trial court's summary judgment for the employer on McGonagle's claim for enforcement of a stock option. The court held that although some essential terms were lacking from the writing evidencing the parties' agreement, extrinsic evidence was admissible to supplement, without contradicting, the written terms of a partially integrated contract. *Id.* at *5. Because the lower court had refrained from considering extrinsic evidence, the matter was remanded for further proceedings. Here, analogously, it is the ambiguity of the "subject to" language that opens the door to extrinsic evidence, which may or may not substantiate Kwasny's claim. *McGonagle* thus represents sound support, not for outright reversal of the summary judgment, as preferred by Kwasny, but for vacating and remanding for further proceedings.

In sum, these three cases say little if anything about construing "subject to" as a condition precedent. In relation to the dispositive rationale of the ruling challenged in this appeal, the cases are beside the point. Yet, because the factual settings and breach-of-contract theories are comparable, the reasoning employed by the Ohio courts is instructive. All three serve to buttress our reasons for vacating the district court's summary judgment ruling in this case and remanding for further proceedings on both parties' claims for declaratory judgment on the enforceability of the Options Grant.

### III. CONCLUSION

Accordingly, we hold that "subject to," viewed in the context of the whole employment contract and the parties' long-term relationship, is susceptible to two reasonable and materially different constructions; that extrinsic evidence must be considered to determine the parties'

intent; that the extant record leaves genuine fact issues that forestall summary judgment at this point. Accordingly, the district court's summary judgment ruling on each party's claim for declaratory judgment is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.