[Cite as *Brown v. Fukuvi USA Inc.*, 2022-Ohio-1608.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MARK J. BROWN | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29294 |
| | : | |
| v. | : | Trial Court Case No. 2019-CV-4550 |
| | : | |
| FUKUVI USA INC., et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 13th day of May, 2022.

. . . . . . . . . .

JOSEPH W. BORCHELT, Atty. Reg. No. 0075387 and ROBERT W. LOTZ, Atty. Reg. No. 0098761, 525 Vine Street, Suite 1500, Cincinnati, Ohio 45202
    Attorneys for Plaintiff-Appellant

KARL R. ULRICH, Atty. Reg. No. 0055852 and JOSHUA R. SCHIERLOH, Atty. Reg. No. 0078325, 40 North Main Street, Suite 1900, Street, Dayton, Ohio 45423
    Attorneys for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, Mark Brown, appeals from the trial court's order granting the motion for summary judgment of Defendant-Appellee, Fukuvi USA, Inc. ("Fukuvi"). Brown contends that summary judgment should not have been granted on his breach of contract claim because Fukuvi had agreed to pay him sales commissions. In addition, Brown claims the court erred in finding: (1) that the statute of limitations barred his claims for promissory estoppel, unjust enrichment, and fraudulent and negligent misrepresentation; and (2) that Ohio's Prompt Pay Act ("PPA") did not apply. Brown also challenges the court's dismissal of claims against Fukuvi Chemical Industry Co., Ltd. ("Fukuvi-Japan") based on lack of personal jurisdiction and the court's failure to grant his motion for partial summary judgment on his breach of contract claim.

{¶ 2} Having reviewed the record, we agree with the trial court that Fukuvi did not agree to pay sales commissions to Brown. The court also did not err in finding that Brown's claims for promissory estoppel, unjust enrichment, and negligent and fraudulent misrepresentation were barred by the applicable statutes of limitation. There were also no genuine issues of material fact concerning Brown's PPA claim, because he was not entitled to payment of any commissions.

{¶ 3} Furthermore, the court correctly denied Brown's motion for partial summary judgment on his breach of contract claim because Fukuvi had not agreed to pay him commissions. In light of our resolution of the other issues, we need not address any issue as to personal jurisdiction over Fukuvi-Japan. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 4} This case involves a dispute between a former employee, Brown, and his employer over whether the employer owed commissions for sales made between 2007 and 2019. On October 2, 2019, Brown filed a complaint against Fukuvi and Fukuvi-Japan alleging breach of contract, promissory estoppel, unjust enrichment, violation of the PPA (R.C. 4113.15), and fraudulent and negligent misrepresentation.

{¶ 5} In the complaint, Brown alleged that the defendants had tendered an offer of employment to him in February 2006 which included payment of commissions and bonuses as part of his compensation beginning on January 1, 2007. However, Fukuvi did not pay any commissions or bonuses during the subsequent 12-plus years of Brown's employment. The complaint detailed Brown's efforts over several years to obtain the promised commissions, Fukuvi's alleged promises and representations as to payment, and Brown's alleged detrimental reliance on those promises.

{¶ 6} On November 20, 2019, Fukuvi filed a separate answer and included various affirmative defenses. On the same day, Fukuvi-Japan filed a motion to dismiss based on lack of personal jurisdiction. Attached to the motion was the affidavit of Hirohisa Oda, which indicated that Fukuvi-Japan was the parent company of Fukuvi and had no relationship with Ohio. Oda also stated that Fukuvi-Japan had no responsibility for Fukuvi's day-to-day operation and had no control over Fukuvi. Brown responded to the motion to dismiss on December 16, 2019, and attached an affidavit and various exhibits to his response. Brown also asked for limited discovery directed to the personal

jurisdiction issue. Fukuvi-Japan filed a reply memorandum on January 8, 2020, and attached a second affidavit from Oda.

{¶ 7} The trial court held an oral hearing on the motion to dismiss on May 22, 2020, and then filed a decision on July 22, 2020, granting the motion and dismissing Fukuvi-Japan as a defendant based on lack of personal jurisdiction. On August 12, 2020, the court filed an amended decision correcting some typographical errors. The decision's substance was unchanged.

{¶ 8} On August 26, 2020, the court established a trial date of August 16, 2021, and a May 10, 2021 summary judgment deadline. The parties then entered into an agreed protective order in late October 2020 to maintain the confidentiality of various documents. On December 3, 2020, Brown filed a motion to compel discovery, arguing that Fukuvi had failed to provide relevant documents. Fukuvi responded on December 17, 2020, and on the same day, it filed a motion for summary judgment. The motion was supported by the affidavit of Akinobu Masunaga, who had been Fukuvi's acting president since 2014. After filing a reply motion concerning his motion to compel, Brown filed a Civ.R. 56(F) motion on January 11, 2021, seeking time to depose witnesses. On January 26, 2021, the court gave Brown a 60-day discovery extension.

{¶ 9} On March 1, 2021, the court granted Brown's motion to compel in part. The court ordered Fukuvi to release information about the salary structure and commissions of Brown's predecessor but denied similar information as to other Fukuvi employees. The court also denied the motion to compel as it pertained to Fukuvi's offers of employment from 2000 to present, other persons who had commission disputes with

Fukuvi, and requests for an electronic search using the terms "bonus," "bonuses," "commission," and "commissions."

{¶ 10} After the parties agreed to summary judgment filing deadlines, Brown filed the depositions of Oda, himself, and Masunaga. Brown then filed a response to Fukuvi's summary judgment motion, as well as a cross-motion for partial summary judgment on his breach of contract claim, on April 23, 2021. Fukuvi's May 14, 2021 reply to these matters was followed by Brown's reply in support of his cross-motion for summary judgment.

{¶ 11} On October 18, 2021, the trial court granted Fukuvi's motion for summary judgment and overruled Brown's motion for partial summary judgment. Brown timely appealed from the trial court's order.

## II. Summary Judgment in Favor of Fukuvi

{¶ 12} Brown's first assignment of error states that:

The Trial Court Erred in Granting Fukuvi USA's Motion for Summary Judgment.

{¶ 13} In arguing that the trial court erred in granting summary judgment, Brown has raised arguments about each claim (i.e., breach of contract, promissory estoppel, etc.) in the form of separate issues for review. We will address each issue in turn, beginning with the breach of contract claim. Before doing so, we will outline standards of review that apply to summary judgment.

## A. Summary Judgment Standards

{¶ 14} We review summary judgments de novo, "which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). In de novo review, we independently review trial court decisions and accord them no deference. *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

{¶ 15} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993), quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Breach of Contract Claim

{¶ 16} According to Brown, he and Fukuvi entered into an enforceable employment

agreement on February 27, 2006, which provided for payment to Brown of commissions and bonuses. Brown concedes that this agreement left certain matters undefined but argues that it was still enforceable. The trial court disagreed, concluding that essential terms were not definite and that there was no meeting of the minds on specific terms. Decision, Entry, and Order Granting Defendant's Motion for Summary Judgment ("Decision") (Oct. 18, 2021), p. 9-10.

{¶ 17} "The elements of a breach of contract claim are 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.' " *Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 38 (2d Dist.), quoting *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994).

{¶ 18} The contract in question here is a February 24, 2006 "Offer of Employment" letter ("Offer Letter") that Brown signed on February 27, 2006, which was his first day of work at Fukuvi. Mark Brown Deposition ("Brown Depo."), p. 56, and Plaintiff's Ex. K. The events that led to the signing of the letter were as follows.

{¶ 19} Since the mid-1980's, Brown had worked as a salesperson for two different companies, where he was paid a combination of a base salary and commission or bonuses. Brown Depo. at p. 18-22. Brown's last employer before Fukuvi was Alliance Wholesale, where he was a regional sales representative for about 10 years. *Id.* at p. 18-19.

{¶ 20} In January 2006, Brown saw an Internet advertisement for a sales job with Fukuvi, and he applied. *Id.* at p. 25. Fukuvi Japan is the major shareholder of Fukuvi and established Fukuvi in the United States. Hirohisa Oda Deposition ("Oda Depo."), p.

15. Fukuvi manufactures construction and industrial products in a facility located in Dayton, Ohio. Fukuvi's business includes both "Victory Bear" products (its private brand) and opposite emblem manufacturing ("OEM"), which involves producing original equipment based on customer specifications. *Id.* at p. 36-37.

{¶ 21} After applying, Brown was interviewed in person by Michi Sonobe-Meier ("Michi"), Fukuvi's human resources manager, and Kyoubzaburo Takagi, Fukuvi's then-president. Brown Depo. at p. 26 and 31. Takagi asked Brown to return and do a presentation for a new product called Tri-Technology Flashing. The person hired for the sales job would be involved in launching this product nationally. *Id.* at p. 27. A few weeks later, in mid-February 2006, Brown made his presentation to several people, including Michi, Takagi, and Ken Lange, who was the Victory Bear salesperson at that time. *Id.* at p. 28.

{¶ 22} Salary and compensation were not discussed during these first two meetings. *Id.* at p. 31-32. The day after the presentation, Michi called Brown to say that Takagi had loved his presentation and that they would love to have him on board. *Id.* at p. 33. An in-person follow-up meeting between Michi and Brown occurred a few days later; Takagi was not present but may have stopped in to say hello. *Id.* at p. 34-35.

{¶ 23} Neither side presented testimony from Michi or Takagi, who had both left the company well before Brown ended his employment in 2019. *Id.* at p. 96 and 136; Oda Depo. at p. 26 and 30; and Akinobu Masunaga Deposition ("Masunaga Depo"), p. 20-21. According to Brown, Michi told him during the follow-up meeting that Fukuvi did a base salary, commission, and a car allowance, and had what Brown described as a

"generous health care package." Brown Depo. at p. 37-38.

{¶ 24} After the follow-up meeting, a series of phone calls ensued, during which Michi and Brown negotiated a salary. In the first call, they discussed the base salary offer, which was around $42,500 to $43,000. When Brown asked for $65,000, Michi reminded him that a commission bonus structure would be in involved. *Id.* at p. 44-45. They did not come to an agreement about the base salary during that call, and nothing else was discussed. *Id.* at p. 45. In a subsequent phone call, Michi came up a few thousand dollars and Brown lowered his demand to around $63,000. Michi told Brown she would have to get Takagi's okay and that Takagi had ultimate authority. *Id.* at p. 46.

{¶ 25} During a third phone call, Michi came up to around $50,000 to $52,000 for the base salary, and Brown lowered his demand to $60,000. *Id.* at p. 46-48. During a fourth phone call, Michi's offer was $58,000, and she was adamant that this was Takagi's final offer. Michi did not have specifics on the commission structure but told Brown to take into consideration the program Fukuvi currently had with its sales people. *Id.* at p. 49-50. A commission and bonus structure for Brown was not in place when this call was made, but Brown accepted the proposed salary and accepted the job. *Id.* at p. 49, 52, and 54.

{¶ 26} Brown's first day of work at Fukuvi was on February 27, 2006. On that day, Michi presented Brown with the Offer Letter, and he signed it. The letter stated, in pertinent part, as follows:

Fukuvi, USA, Inc. is pleased to offer you the position of Sales

Representative under the terms and conditions set forth below. If

acceptable your first day of employment will be February 27, 2006.

> **Salary**: Base Salary $1115.39/week (Exemption from overtime pay)
>
> This changes to $884.62/week + Commission/bonus January 1st 2007.
>
> Details will be discussed on [sic] December 2006.
>
> Car allowance $600/month (Gross pay), this includes all maintenance.

> **Benefits**: * * *

By accepting this offer, you agree that your employment with Fukuvi USA Inc. is not for a fixed term and may be terminated at the will by either you or the Company, with or without cause.

Ex. K, p. 1.

**{¶ 27}** Brown signed the Offer Letter on February 27, 2006, under a statement which said:

> I accept Fukuvi USA's offer of employment, including the terms and conditions described in this letter, and acknowledge that this offer does not constitute a contract of employment for a fixed term, and that the employer relationship is at will.

*Id.*

**{¶ 28}** According to Brown, on February 27, 2006, he and Michi discussed the provision in the salary paragraph that said "Details will be discussed on [sic] December 2006." Brown Depo. at 67. Later that day, Brown made notes about their discussion. *Id.* at p. 68 and Plaintiff's Ex. M. Because details remained that needed to be resolved and may have been related to a 90-day probationary period, Brown asked Michi to give him a "vague detail." As a result, Michi gave Brown what was in place for the other

salesperson, Ken Lange.   *Id.* at p. 68.   Again, according to Brown, these details are contained in Ex. M (basically notes about 5% on "Flashing," "$250,000 & over"; "Victory Bear Products," "$100,000 & over"; 2.5%-5%"- "TBD"?; "Bonus details unknown").

{¶ 29} After Brown started, he was involved with the Tri-Tech (or Flashing) sales, and Lange handled Victory Bear; the two men had their own portfolios and did not work together.   Brown Depo. at p. 58.   About three months after Brown began his employment, Lange left, and Takagi assigned Lange's duties to Brown.   *Id.* at p. 58 and 61.   Another employee was hired to be an inside sales person who would report to Brown.   Brown's title was then changed to "sales manager."   *Id.* at p. 76-78.

{¶ 30} When Brown took over Lange's duties and files, he found a November 4, 2003 commission sheet which showed Lange's commissions for that year.   This had been left in Lange's files.   *Id.* at p. 123-124, and Plaintiff's Ex. H.   Also in the same files was a document entitled "Policy for Commission Payment," which was dated 7/22/03 and outlined "commission guidelines."   *Id.* at p. 127-128, and Plaintiff's Ex. G.

{¶ 31} Around the beginning of December 2006, Brown met with Michi to ask if the commission bonus structure had been worked out yet.   Brown Depo. at p. 72-73.   At that time, Michi gave him a commission sheet and Brown believed it illustrated how this was "going down."   *Id.* at p. 73 and 125, and Plaintiff's Ex. I.   Ex. I had Brown's name on it, was entitled "Quarterly Sales Rep. Commission Report," and was dated "31-Dec-06."   It also had columns labeled "1st quarter," "2nd quarter," and so on, where information could be inserted about various items.   These items include matters like "Sales Tilt-Up," "Sales/Tri-Tec," "Less Budget – under $500,000," "Less 90 days past

due," "Net Sales," "Less Adjustments," "Adjusted Net Sales," and so forth. *Id.* However, all the columns on this document were blank, i.e., no information was filled in.

**{¶ 32}** Brown subsequently met with Takagi in December to discuss the commission/bonus. Brown told Takagi that he had agreed to the base salary only because he knew a commission structure was in place with other salespeople and that managing on his base salary was difficult. Brown Depo. at p. 73-74. At that time, Takagi said he understood, but there was a "very severe situation" with the company. *Id.* at p. 74. Takagi also said, "we will make right." *Id.* Leaving the meeting, Brown understood that Fukuvi "was not in a position to institute a commission or bonus arrangement because of its financial condition." *Id.* at p. 75. He also understood the conversation to mean that the company would make him whole. *Id.*

**{¶ 33}** A note produced by Fukuvi and dated December 21, 2006, stated that "Mr. Takagi confirms that [Brown's] compensation stays the same until further notice." *See* Masunaga Depo. at p. 55 and Plaintiff's Ex. L (Fukuvi Bates Number Fukuvi0000014). Brown denied that Takagi had told him this during the December 2006 meeting. Brown Depo. at p. 75-76.

**{¶ 34}** In contrast to what was stated in the Offer Letter, Brown's salary did not decrease to $884.63 per week (or $46,000.24 yearly) on January 1, 2007. Instead, it stayed at $58,000 and remained at that level until after Takagi left Fukuvi several years later. Brown Depo. at p. 103-104, Plaintiff's Ex. N, and Oda Depo. at p. 77-78. On January 11, 2007, Brown's title on his business card was changed from "North American Sales/Construction Products" to "North American Sales and Marketing Manager." Oda

Depo. at p. 45 and Plaintiff's Ex. D.

{¶ 35} On April 18, 2007, Brown gave Takagi a letter discussing his compensation and attaching a proposal regarding several compensation programs. Brown Depo. at p. 78 and Plaintiff's Ex. P. The letter stated, in relevant part, as follows:

Mr. Takagi:

Late last year we have discussed compensation and you requested that we wait until the end of the first quarter. Currently, we are way into the second quarter and I feel things are starting to show signs of turning up for us, thus I would like to revisit my compensation package. With regards to a new compensation program I have done much research into the scale of compensation for the position I have taken on. I started at the low end of the scale when putting the numbers together. I would first like to discuss 2006. After taking over [K]en's duties as well as handling the TTF launch and field/product development and having a good year for VB [Victory Bear] sales, I was planning on being compensated for handling both rolls [sic]. *Though you and I never discussed it*, I was under the belief that I would have been compensated the commissions that [K]en would have received.

* * *

The 2006-year sales numbers and the commission scale that Ken Lange was on would have resulted in a $4200.00 pay out in commission. I was given a program by Michi Sonobe, HR Manager, that spelled out the program as follows:

1.  5% commission paid after $250,000 of sales on all Tri-Tech Flashing Sales.

2.  2.5-5% commission paid after $250,000 of sales paid on all Victory Bear Constructions Products after Ken Lange left the company and I took over. Please see the compensation programs I have put together below and let me know when you can sit down and discuss this. If these are not acceptable, the original proposal stays in place.

\* \* \*

(Emphasis added.)   Ex. P at p. 1.

{¶ 36} The "original proposal" that Brown referenced was that contained in paragraphs one and two in the letter to Takagi, i.e., the program that Michi had allegedly given Brown in December 2006. Brown Depo. at p. 89. Brown had never discussed commission with Takagi. The only discussions Brown would have had about commission were with Michi. *Id*. at p. 87.

{¶ 37} The alternate proposals attached to the letter included: (1) a $65,000 base salary and 2.5% of total Victory Bear revenue starting January 1, 2007; or (2) an $85,000 base salary and 2.5% of sales after a $250,000 sales mark were reached, starting January 1, 2007. Brown also proposed additional incentive bonuses based on 3% of annual sales, paid quarterly based on quarterly sales results, starting with the end of the first quarter in 2007, and an annual bonus in cash or non-cash compensation of 1% of all new business developed. In addition, the letter proposed a $600 per month car allowance and home office resources, including computer, fax, and payment of internet

and server costs.   Ex. P, at p. 2.

{¶ 38} Brown could not recall the first time he and Takagi discussed these proposals, but they never reached agreement about a change in the compensation schedule.   Brown Depo. at p. 90-91.   Brown further stated that he and Takagi had many sit-downs over the next three years, and many were about this letter.   *Id.* at p. 89-90. According to Brown, Takagi was "typically elusive when it came to things like this."   *Id.* at p. 84.   Nonetheless, Brown continued to work under the $58,000 salary.

{¶ 39} In June 2010, Brown sent an email to Takagi, expressing his "ongoing concern about his compensation and commission/bonus program."   Brown also said that "I really need to have this issue settled and then talk about how to make things whole for the lost compensation since my start with FUI in 2006."   *Id.* at p. 108 and Plaintiff's Ex. Q, p. 2.   Takagi responded, "Please note as I repeated [sic] you because company severe financial situation let us visit again after this good planned sales year.   I understand family situation and we will work to this situation for you."   Ex. Q at p. 1.   The company's financial situation was Takagi's standard answer as to why it could not enter into a commission or bonus arrangement.   Brown Depo. at p. 110.[1]

---

[1] Brown forwarded these June 2010 emails to his Fukuvi email address on July 12, 2019, which was months after he left employment with Fukuvi.   The emails were forwarded from Brown's home email address.   Brown said he had originally emailed these documents from Fukuvi to his home email at some point and had saved them on his home computer.   Brown Depo. at p. 111-115.   Brown denied modifying these emails but had no explanation of why he would email documents to his Fukuvi email address when he no longer worked there.   *Id.* at p. 115-116.   Fukuvi witnesses were suspicious of Ex. Q because Brown had sent it after he left employment.   In addition, Fukuvi had changed its system, and its server no longer had old emails like this.   Oda Depo. at p. 85-88; Masunaga Depo. at p. 58-63.   For summary judgment purposes, we accept Brown's testimony that these emails were real and occurred in June 2010.

{¶ 40} Brown continued to work at Fukuvi at the salary of $58,000 until after Takagi left the company. The precise date that Takagi left was not specified, but Ed Miller, the next president of Fukuvi, was sent over from Japan and was there in the spring of 2012. *Id.* at p. 92 and 95-96. In late April 2012, Brown obtained a copy of his Offer Letter from a new person handling human resources and sent it to Miller, asking for a resolution of his commissions and to start a negotiation about the commission arrangement. *Id.* at p. 91-97 and Plaintiff's Ex. R. Brown then had a meeting with Miller during which he stated that the commission structure needed to be resolved, and Miller agreed. Brown Depo. at p. 100-101.

{¶ 41} In a second meeting, Miller came back with a commission proposal based on Brown's travel budget, and Brown immediately verbally rejected it. *Id.* at p. 101-102. Brown made a counterproposal based on what he "had been brought in here with," and Miller responded, "Yeah, but that was never put into place, was it?" *Id.* at p. 102. Brown then replied, "The promises were made that it would be whole and my trust was there." *Id.*

{¶ 42} Following this discussion, no changes were made concerning commission, nor did Brown receive payment for any claim to past commissions. In August 2012, Miller raised Brown's salary to $65,000 per year. *Id.* at p. 103 and Plaintiff's Ex. N. In November 2012, Miller gave Brown another salary raise, to $70,000. *Id.* at p. 106. Before leaving Fukuvi in March 2019, Brown had received another raise; his salary when he terminated his employment was $74,864 per year. *Id.* at p. 107.

{¶ 43} There is no indication that commissions were discussed further before Miller

left Fukuvi.   Oda Depo. at p. 27.   When Miller left, Akinobu Masunaga, a Fukuvi-Japan employee, was assigned as president of Fukuvi in September 2013.   Masunaga was still in that position when Brown left the company in March 2019.   *Id.* at p. 24-25; Masunaga Depo. at p. 7.   In February 2019, Oda took a position with Fukuvi as general manager of corporate management.   Oda Depo. at p. 10.   There is no indication that Brown mentioned entitlement to commissions or past commissions between September 2013 and February 2019, when Oda came to work at Fukuvi.   Thus, after Miller rejected Brown's position in the spring of 2012, and until February 2019 (or for almost seven years), Brown did not request a commission or bonus structure, nor did he assert a claim to past commissions.

{¶ 44} Oda met Brown in September 2018 when he visited Fukuvi, and on Oda's first day of work on February 4, 2019.   On the latter day, Brown said he had been waiting for Oda to be there to discuss something.   Oda Depo. at p. 18.   According to Oda, Brown wanted to talk about how hard he worked for Fukuvi and his contributions.   *Id.* at p. 19.   Subsequently, in a lunch with Oda and Masunaga on February 12, 2019, Brown discussed claims for past commission, and provided them with a chart mentioning figures of $529,861 and $1,059,772 related to commissions of 2.5% and 5%, respectively on Fukuvi revenue of more than $21,000,000.   Brown prepared these figures as part of a negotiation. Brown Depo. at p. 117-119, Oda Depo. at p. 47-50 and Plaintiff's Ex. E. Oda indicated, however, that the figures made no sense, since Fukuvi's total profit for the 13 years of Brown's employment was only around $900,000.   Oda Depo. at p. 51-52. Brown also showed Oda and Masunaga the November 2003 commission statement for

Lange. *Id.* at p. 57 and Ex. H. Oda did not follow up on this, as there had been no agreement with Brown for commission. Oda Depo. at p. 21-22.

**{¶ 45}** During the lunch, Brown also said he was thinking of transferring to another company that had given him an attractive offer. *Id.* at p. 20. On February 25, 2019, Brown sent Masunaga an email offering to stay with Fukuvi for a substantial increase in salary, plus "a growth incentive bonus/commission program written in to make up for the missed contractual commissions program" he "was given" when he started at Fukuvi. *Id.* at p. 94-95 and Plaintiff's Ex. S. Brown indicated in the email to Masunaga that he had already accepted a position at another company. *Id.* at Ex. S.

**{¶ 46}** Masunaga and Matsuura (the vice-president of Fukuvi's global business headquarters) discussed promoting Brown to vice president. In a February 28, 2019 email, Matsuura told Brown that he would like to promote him to that position pending approval of the Fukuvi board. There is no indication that a salary increase was mentioned, and there was no formal offer. Masunaga Depo. at p. 31-32; Oda Depo. at p. 42, and Plaintiff's Ex. B. Brown then left Fukuvi on March 15, 2019, and began working for his new employer. Oda Depo. at p. 38; Brown Depo. at p. 6. On October 2, 2019, Brown filed suit against Fukuvi and Fukuvi-Japan.

**{¶ 47}** The trial court concluded that essential terms in the Offer Letter had not been definite and that there had been no meeting of the minds on specific terms in the letter.

**{¶ 48}** Ohio follows the doctrine of "at-will" employment. *E.g. Lunsford v. Sterilite of Ohio, L.L.C.*, 162 Ohio St.3d 231, 2020-Ohio-4193, 165 N.E.3d 245, ¶ 25. Under this

doctrine, "either party to an at-will employment contract can propose changes to the terms of their employment relationship at any time." *Id.*, citing *Lake Land Emp. Group of Akron, L.L.C. v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, ¶ 18. "If, for instance, an employer notifies an employee that the employee's compensation will be reduced, the employee's remedy, if dissatisfied, is to quit. Similarly, if the employee proposes to the employer that he deserves a raise and will no longer work at his current rate, the employer may either negotiate an increase or accept the loss of his employee." *Lake Land* at ¶ 18. The Offer Letter that Fukuvi's representative and Brown signed clearly stated that Brown's employment was at will.

**{¶ 49}** Despite the general principle of employment at will, parties may contract with respect to various terms. *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St.3d 571, 574, 653 N.E.2d 381 (1995) (express or implied contract is one exception to the at-will employment doctrine). A contract is " '[a] promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' " *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991), quoting Restatement of the Law 2d, Contracts, Section 1, at 5 (1981). "In order to declare the existence of a contract, both parties to the contract must consent to its terms * * *; there must be a meeting of the minds of both parties * * *; and the contract must be definite and certain." *Id.*

**{¶ 50}** Courts have held that "an agreement to agree is not per se unenforceable, but rather the enforceability of such an agreement depends on whether the parties have manifested an intention to be bound by its terms and whether these intentions are

sufficiently definite to be specifically enforced." *Padula v. Wagner*, 2015-Ohio-2374, 37 N.E.3d 799, ¶ 18 (9th Dist.), citing *Normandy Place Assocs. v. Beyer*, 2 Ohio St.3d 102, 105-106, 443 N.E.2d 161 (1982).

**{¶ 51}** "When the terms of a contract are not sufficiently definite, the contract is unenforceable." *Nilavar v. Osborn*, 137 Ohio App.3d 469, 487, 738 N.E.2d 1271 (2d Dist.2000), citing *Isquick v. Classic Autoworks, Inc.*, 89 Ohio App.3d 767, 772, 627 N.E.2d 624 (8th Dist.1993). " 'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.' " *Mr. Mark Corp. v. Rush, Inc.*, 11 Ohio App.3d 167, 169, 464 N.E.2d 586 (8th Dist.1983), quoting Restatement of the Law 2d, Contracts, Section 33, at 92 (1981).

**{¶ 52}** The Offer Letter set out a salary of $1,115.39 per week (or $58,000.28 per year), which was expected to change to "$884.62/week + Commission/bonus" on January 1, 2007 (or $46,000.24 plus commission/bonus). Ex. K at p. 1. The letter further stated that "Details will be discussed on [sic] December 2006." We agree with the trial court that this provision was not definite enough to be enforced. First, no specific amount of commission or bonus was outlined. Furthermore, details were to be discussed at some future date, with no indication of what those details would be.

**{¶ 53}** Moreover, when the discussion eventually occurred, there was no agreement that commissions or bonuses would be paid. Contrary to the statement in the Offer Letter, Brown's salary was not reduced, nor was an agreement reached as to what commission or bonus, if any, would be paid. Instead, Brown continued to work at the $58,000.28 salary outlined in the Offer Letter. Again, at that point, based on the

contract, there would have been no remedy, as the parties had never agreed to a specific amount of commission.

{¶ 54} In arguing that the contract was enforceable, Brown contends that he was told when he signed the Offer Letter that "his commission structure would operate in the same manner as the prior sale representative, which was a percentage on sales over an initial threshold or goal." Appellant's Brief at p. 10. However, taking this statement at face value, it was made by a person who lacked authority to authorize payment of commissions; it was also inconsistent with the letter, which said that details would be discussed later. When "later" came, Fukuvi elected not to pay commissions due to the severe financial position of the company, and this was communicated to Brown. At that point, if Brown were dissatisfied with the situation, he could have left the company. Instead, he chose to stay. Notably, his salary was not decreased to the considerably lower level mentioned in the Offer Letter.

{¶ 55} As support for his position, Brown has cited *4218868 Canada, Inc., dba Pivotal Holdings, Ltd. v. Kwasny*, 654 Fed.Appx. 727 (6th Cir.2016), which he claims is similar to his case. Having reviewed this case, we disagree. In *Pivotal Holdings*, the plaintiff was given a written grant of options after he had been employed for about a year, and five months after he had been promoted. *Id*. at 728. The grant from the plaintiff's employer stated that:

> 4218868 Canada Inc. ("4218868") is pleased to provide you with "a grant of options representing 1% of the fully diluted value of 4218868 subject to the execution of a definitive options agreement outlining the terms and

conditions under which such options may be exercised. The options will have an exercise value of $0.01 per share. 4218868 owns 100% of the issued and outstanding common shares of Pivotal Payments Corporation and Payment Systems Merchant Services, Inc.

*Id.* at 728.

{¶ 56} The issue before the district court and the court of appeals was whether "the Options Grant unambiguously created a condition precedent that was never fulfilled, rendering the promised stock options unenforceable" or whether it was ambiguous and "extrinsic evidence must be considered to determine the parties' intent." *Id.* The district court found the grant unambiguous and rendered summary judgment in the company's favor; the court of appeals disagreed, finding the agreement ambiguous and that genuine issues of material fact existed. *Id.*

{¶ 57} *Pivotal Holdings* is superficially similar to the current case in that the plaintiff continued to work for the company for quite a few years after the grant was created, and he asserted that it "was an element of increased compensation to induce him to stay on as Vice President in September 2004 even though his duties imposed hardship, requiring him to spend approximately half the year in Montreal, away from family." *Id.* at 732. The similarly ends there, however. Unlike the case before us, there was a signed agreement in *Pivotal Holdings* after the plaintiff had been employed for about a year and had been promoted. Here, there was no post-employment agreement.

{¶ 58} Furthermore, the issue in *Pivotal Holdings* was whether the words "subject to" "unambiguously constituted a promise to perform in the future if the condition

precedent is met, rather than a present promise to perform when the condition is met." *Id.* at 731. The court of appeals found the language ambiguous and concluded that the district court had improperly failed to review the parties' entire employment agreement and its subject matter to determine the parties' intent. *Id.* The court further found the district court's reasoning "flawed as a matter of law," because it had "ignored the preference under Ohio law for not construing conditions as conditions precedent." *Id.*

{¶ 59} This is not the situation here. There were no "conditions precedent" in the Offer Letter. "[A] condition precedent is one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, after the terms of the contract have been agreed on, before the contract shall be binding on the parties." *Mumaw v. W. & S. Life Ins. Co.*, 97 Ohio St. 1, 11, 119 N.E. 132 (1917). *Accord Dart v. Katz*, 2d Dist. Montgomery No. 28913, 2021-Ohio-1429, ¶ 32. There is no contention here that the binding nature of the Offer Letter was based on some type of future act.

{¶ 60} The statement that details would be discussed later is also not ambiguous. To the contrary, it plainly indicates that a decision on what commission or bonus might apply in the future would be decided later. " 'Contractual language is "ambiguous" only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.' " *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, 41 N.E.3d 145, ¶ 30 (2d Dist.), quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55-56, 716 N.E.2d 1201 (2d Dist.1998). If contractual ambiguities exist, courts may consider

extrinsic evidence, but they may not " 'use extrinsic evidence to create an ambiguity. Rather, the ambiguity must be patent; that is, apparent on the face of the contract.' " *Id.*, quoting *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir.1996).

{¶ 61} Here, the parties may have envisioned a commission and bonus structure, but the details were left to future discussion. Consequently, there was no enforceable promise. *Compare Gill v. Monetary Mgt. Corp.*, 8th Dist. Cuyahoga No. 69949, 1996 WL 532080, *5 (Sept. 19, 1996) (offer letter stating that company "would structure" bonus payment after a year was not specific promise, was not defined, and there was no meeting of minds regarding essential terms); *Imbrogno v. Mimrx.com, Inc.*, 10th Dist. Franklin No. 03AP-345, 2003-Ohio-6108, ¶ 9 (offer letter providing that "Stock Options commensurate with your position will be offered" was illusory and indefinite); *Sickle-Santanello v. OhioHealth Corp.*, Franklin C.P. No. 10-CV-17393, 2013 Ohio Misc. LEXIS 9345, at *10-11 (Aug. 19, 2013) (language indicating that "Plaintiff 'will be eligible' for the incentive program * * * is too indefinite and unrestricted to constitute a meeting of the minds"); *Meyer v. AmerisourceBergen Drug Corp.*, 264 Fed.Appx. 470, 475 (6th Cir.2008) (plaintiff was not entitled to bonuses or stock option because agreement left open possibility of incentive compensation but did not guarantee it; agreement on this point, therefore, was illusory and unenforceable); *Dolder v. Auto Boutique Collision, Ltd.*, 10th Dist. Franklin No. 18AP-132, 2018-Ohio-4508, ¶ 14 ("[C]ontract's commission payments provision contains no indication the parties reached any agreement in defining the circumstances under which a commission would be due to [employee]. Therefore, in the absence of a meeting of the minds as to what triggers the earning of a commission, this provision is

indefinite and uncertain, rendering the promise illusory.").

{¶ 62} Brown also argues that Fukuvi had a policy regarding payment of commissions that could have been enforced. In this regard, Brown points to various documents filed under seal which show that Lange was paid commission at certain levels from 2003 through 2006. Appellant's Brief at p. 16, referencing Ex. A to Plaintiff's Reply in Support of Cross-Motion for Summary Judgment, Filed Under Seal With No Remote of Direct Access by Public (Fukuvi1000424-1000427). Again referring to the documents filed under seal, Brown notes that on February 20, 2006, Fukuvi had prepared an outline of the commission structure for its incoming sales representative. *Id.* at Fukuvi1000442.

{¶ 63} We have reviewed the documents. Notably, Brown fails to point to evidence that any of these documents were given to him before he accepted employment or before he signed the Offer Letter on February 27, 2006. Brown also fails to point to any evidence that these documents were part of the parties' agreement or were intended to be part of the agreement. The "outline" of the commission structure does not even indicate who prepared it, and no evidence was presented in the trial court about this document, other than that it existed, i.e., it contained a Bates Stamp with a Fukuvi label.

{¶ 64} Based on the preceding discussion, we agree with the trial court that there was no enforceable written contract requiring payment of a commission and/or bonuses.

{¶ 65} We also note that "[s]ubsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified, neither consideration nor a writing is necessary." (Footnote omitted.) *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App.3d 163, 172, 583 N.E.2d 1056 (1st Dist.1990). *See also Citizens Fed. Bank, F.S.B.*

*v. Brickler*, 114 Ohio App.3d 401, 408, 683 N.E.2d 358 (2d Dist.1996); *Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, at ¶ 22 (consideration for different terms "exists where an at-will employer and an at-will employee continue their employment relationship, rather than terminate it, after the employer imposes a new requirement for employment").

{¶ 66} An argument could be made that even if the parties had agreed to a commission structure, the agreement was later modified when no commissions were paid, Brown's salary was not reduced, and Brown continued employment with Fukuvi for more than 12 years. However, we need not consider this issue because there was never an enforceable agreement to pay commissions.

### B. Summary Judgment on Promissory Estoppel

{¶ 67} Brown's second argument under this assignment or error is that the trial court erred in denying his promissory estoppel claim. In this regard, Brown presents two arguments: (1) the court erred on the merits; and (2) the claim is not time-barred. We will address the latter argument first, since if the claim is barred, there is no reason to discuss the merits.

{¶ 68} Concerning this point, Brown contends that his action is not barred, based on the application of equitable estoppel. He further argues that the limitations period did not expire because each year Fukuvi failed to pay commissions represented a continuing violation. As a result, the limitations period would have run from the latest lapsed commissions in 2018 and 2019.

**{¶ 69}** "An action for damages under promissory estoppel provides an adequate remedy for an unfulfilled or fraudulent promise. 'The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.' " *Olympic Holding Co. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, ¶ 39, quoting *Doe v. Univision Television Group, Inc.*, 717 So.2d 63, 65 (Fla.App.1998). "To prove a claim for promissory estoppel, the party must prove the following elements: 1) a clear and unambiguous promise, 2) reliance by the party to whom the promise is made, 3) the reliance must be reasonable and foreseeable, and 4) the party relying on the promise must have been injured by the reliance." *Mishler v. Hale*, 2014-Ohio-5805, 26 N.E.3d 1260, ¶ 28 (2d Dist.), citing *HAD Ents. v. Galloway*, 192 Ohio App.3d 133, 2011-Ohio-57, 948 N.E.2d 473, ¶ 22 (4th Dist.).

**{¶ 70}** Courts have held that the six-year statute of limitations in R.C. 2305.07 applies to claims based on promissory estoppel. *City of Cleveland Hts. v. City of Cleveland*, 8th Dist. Cuyahoga No. 79167, 2001 WL 1400015, *5, fn. 3 (Nov. 8, 2001); *Porterfield v. Bank One Ohio Tr. Co.*, 10th Dist. Franklin No. 97APE05-602, 1997 WL 566197, *2, fn. 2 (Sept. 9, 1997); *Cooper v. City of W. Carrollton*, 2018-Ohio-2547, 112 N.E.3d 477, ¶ 36 (2d Dist.).[2] "Ordinarily, a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed." *Collins v. Sotka*, 81 Ohio St.3d 506, 507, 692 N.E.2d 581 (1998).

**{¶ 71}** According to Brown, Takagi told him in December 2006 that Fukuvi would

---

[2] After this action was filed, the limitations period in R.C. 2307.05(A) for actions based on contracts not in writing (which would include promissory estoppel) was reduced to four years from six years. *See* S.B. 13, 2020, 2021 Ohio Laws 1. The six-year period would apply here.

make it "right" concerning commissions. Accepting for the sake of argument that this vague statement means what Brown says it does, that was the date of the alleged wrongful act, and the limitations period would have lapsed in December 2012 – clearly more than six years before October 2019, when Brown brought the current action.

{¶ 72} As to equitable estoppel, this doctrine "prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *Doe v. Archdiocese of Cincinnati*, 116 Ohio St.3d 538, 2008-Ohio-67, 880 N.E.2d 892, ¶ 7, quoting *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.*, 71 Ohio St.3d 26, 34, 641 N.E.2d 188 (1994).

{¶ 73} In 2006, the Supreme Court of Ohio clarified the differences between equitable estoppel and promissory estoppel. *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 18. " 'It is generally held that a representation of past or existing fact made to a party who relies upon it reasonably may not thereafter be denied by the party making the representation if permitting the denial would result in injury or damage to the party who so relies. The party making the representation is denied, by virtue of equitable estoppel, the right to plead or prove the existence of facts contrary to his representations.' " *Id.* at ¶ 20, quoting 4 R. Lord, *Williston on Contracts*, Section 8:3 at 28-31, (4th Ed.1992).

{¶ 74} Promissory estoppel was developed against this backdrop, but in a number of cases, the representation involved an intention rather than a fact, "where the party making the representation asserted that he would do or refrain from doing something in the future he made a promise, though it might also be considered a representation of his

intention. If the promise was gratuitous, not backed by consideration, the promisee would have no remedy. No equitable estoppel could exist since the promisee had not relied upon a statement of fact; no action for breach of contract could be brought since the promise was gratuitous." *Id.* at ¶ 21, quoting *Williston on Contracts*, Section 8:4 at 38-46. "Thus, the key distinction between the two doctrines is whether the estoppel arises from a promise and not a misstatement of fact." *Id.* at ¶ 25.

{¶ 75} Takagi's alleged statement related to an intention and was gratuitous, since the contract did not require payment of specific commission. The theory of promissory estoppel, therefore, would apply, not equitable estoppel, which is a separate theory. Brown contends, nonetheless, that equitable estoppel "precludes a defendant from using the statute of limitations as a defense when defendant's conduct induced the delay in filing the action." Appellant's Brief at p. 21.

{¶ 76} The Supreme Court of Ohio has stressed that " '[i]t is fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit * * *.' " *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, ¶ 45, quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 674, 816 N.Y.S.2d 703, 849 N.E.2d 926 (2006).

{¶ 77} Having reviewed the entire record, we find it devoid of any evidence that Fukuvi in any way prevented Brown from filing suit. Brown was apparently aware from at least December 2006 of the facts giving rise to his alleged claims, and Fukuvi did not conceal this from him or prevent him from filing suit. Consequently, we reject the assertion that equitable estoppel prevents application of the statute of limitations.

{¶ 78} Brown's second claim is that the statute of limitations has not elapsed based on a continuing violation occurring every time Fukuvi failed to pay commissions. We previously rejected such a theory in a promissory estoppel case. *See Cooper*, 2018-Ohio-2547, 112 N.E.3d 477, at ¶ 36-44. In *Cooper*, an employee asserted claims for breach of contract, implied contract, and promissory estoppel against his employer. The claims were based on the city's failure to pay the employee an increased salary after he thought he had been promoted in 2008. *Id.* at ¶ 8-14.

{¶ 79} The plaintiff noticed a few months after being "promoted" that he was not receiving additional pay and asked his supervisor about it. The supervisor said he would "get with" the city manager to discuss it, but never got back to the plaintiff with an answer. *Id.* at ¶ 13-14. The plaintiff asked his supervisor several times about it; in one instance, in 2008, the supervisor stated that the plaintiff had turned down the job promotion. *Id.* at ¶ 15. Four or five years later, the plaintiff talked to the city manager, who "basically laughed" at him and said, " 'you've been doing it for four or five years, how do you expect me to take it to council?' " *Id.* at ¶ 16. These facts are similar to what occurred in the case before us.

{¶ 80} About seven years after the alleged promotion, the plaintiff brought suit, and his implied contract and promissory estoppel claims were dismissed based on expiration of the statute of limitations. *Id.* at ¶ 22-23. The contract claim was dismissed on the merits. *Id.* at ¶ 24. On appeal, we affirmed the trial court's decision. *Id.* at ¶ 46.

{¶ 81} Regarding the dismissal of the promissory estoppel claim, the plaintiff in *Cooper* asserted, as here, that the statute of limitations was tolled based on the

"continuous violation doctrine." *Cooper* at ¶ 39. We rejected this theory for several reasons: (1) the Supreme Court of Ohio had taken the position that courts are reluctant to apply this doctrine outside the civil rights context; (2) "continuing violations are distinguished from 'continuing effects of prior violations'; in this context, ' " ' "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation" ' " ' "; and (3) the lack of authority in Ohio extending this doctrine to breach of contract cases. *Id.* at ¶ 40-41, quoting *State ex rel. Nickoli v. Erie MetroParks*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, ¶ 31. (Other citations omitted.)

**{¶ 82}** The same reasoning applies here. Brown's action is based on Takagi's alleged representation in December 2006 that Fukuvi would make the situation "right," and Brown claims entitlement to commissions dating from January 1, 2007, when, by his account, Fukuvi should have begun paying him. The continual ill effects allegedly resulted from this original violation, not from Fukuvi's failure to pay Brown commission each quarter between 2007 and 2019.

**{¶ 83}** Furthermore, even if we used other dates for the alleged promise to pay, such as Takagi's statement to Brown in June 2010 that Fukuvi would "work to this situation for you" (whatever that means), that would not help Brown. Specifically, when Brown had a discussion with Takagi's successor, Ed Miller, at some point between late April and August 2012, Miller specifically stated that no commission structure had been put in place and also rejected Brown's counterproposal seeking payment of commissions. Instead, Miller gave Brown a raise in August 2012. At that point, it was clear that Fukuvi did not agree with Brown's position and did not intend to pay commissions. However,

Brown still failed to file suit within six years, or by August 2018. Accordingly, even if a continuing violation analysis were applied, Brown's promissory estoppel claim is barred. In light of this conclusion, Brown's promissory estoppel claim is without merit.

### C. Unjust Enrichment

{¶ 84} According to Brown, the trial court erred in finding that he was not entitled to recover under a theory of unjust enrichment and in finding that this claim was barred by the statute of limitations. In ruling on the unjust enrichment claim, the court concluded that Brown had failed to show "Fukuvi deprived him of a benefit owed because nothing has been wrongfully withheld." Decision (Oct. 18, 2021), at p. 16. The court further held that this claim was barred by the statute of limitations because Brown's claims stemmed from the commission and/or bonus structure he believed was wrongfully withheld in 2007. *Id.*

{¶ 85} Again, we need not address the merits of the unjust enrichment claim if it is barred. As with promissory estoppel, the statute of limitations for unjust enrichment is governed by R.C. 2305.07. *Unifund CCR Partners Assignee of Palisades Collection, L.L.C. v. Hemm*, 2d Dist. Miami No. 2008-CA-36, 2009-Ohio-3522, ¶ 26. As noted, the time period to be applied here is six years.

{¶ 86} For the reasons previously mentioned, this claim is barred by the statute of limitations. "The elements of an unjust enrichment claim are as follows: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be

unjust to do so without payment (i.e., the 'unjust enrichment' element)." *Crawford v. Hawes*, 2013-Ohio-3173, 995 N.E.2d 966, ¶ 34 (2d Dist.), citing *L & H Leasing Co. v. Dutton*, 82 Ohio App.3d 528, 534, 612 N.E.2d 787 (3d Dist.1992). The claim accrued as of 2007, when Fukuvi failed to pay commissions as Brown believed it should have. Six years from that date would have been 2013.

{¶ 87} Furthermore, for the reasons previously discussed, equitable estoppel and a "continuing violation" theory do not apply to salvage the claim. In addition, even if the statute of limitations had not lapsed, Brown could not recover.

{¶ 88} Unjust enrichment is based on quasi-contract. "A quasi-contract is a contract implied so as to prevent injustice. * * * It is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy." *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44, 46, 472 N.E.2d 704 (1984). "A party pursuing relief for breach of contract cannot at the same time seek equitable relief for unjust enrichment because, 'absent evidence of fraud, illegality, or bad faith, compensation is governed by the parties' contract.' " *Shannon v. Lutz*, 2d Dist. Greene No. 1998-CA-21, 1998 WL 853053, *3 (Dec. 11, 1998), quoting *Weiper v. W.A. Hill & Assocs.*, 104 Ohio App.3d 250, 261, 661 N.E.2d 796 (1st Dist. 1995). *See also LeVangie v. Raleigh*, 2d Dist. Montgomery No. 27946, 2019-Ohio-810, ¶ 16 (" 'equitable action in quasi-contract for unjust enrichment will not lie when the subject matter of that claim is covered by an express contract or a contract implied in fact' "); *Joseph Oldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc.*, 2d Dist. Montgomery No. 14788, 1995 WL 276804, *6 (May 10, 1995) (" 'It is well-established that

"the theory of quasi-contract or unjust enrichment is not available when an express contract will afford the complainant the same recovery.' ")

{¶ 89} Brown's claims here were based on an express contract that he claimed provided for payment of commissions. The trial court held otherwise, and we have agreed. The other basis for Brown's claims was promissory estoppel, i.e., that Fukuvi made oral representations outside the contract on which Brown relied to his injury. This claim was based on alleged intention, i.e., a promise to make things "right," and was not necessarily inconsistent with the fact that the parties had entered into an express contract. *Mishler*, 2014-Ohio-5805, 26 N.E.3d 1260, at ¶ 28. Under these circumstances, unjust enrichment would not also apply.

### D. Prompt Pay Claim

{¶ 90} Brown's next argument under this assignment of error is that the trial court erred in concluding that the PPA did not apply to his claims. Brown concedes that post-employment commissions are not covered, but contends that his commissions were earned during employment and are undisputed. According to Brown, his commissions, therefore, are covered by the PPA.

{¶ 91} Ohio's PPA requires employers to pay wages within certain times after they are earned – typically, twice a month, unless "a given trade, profession or occupation" customarily uses a different time lapse, or a different time lapse is established "by written contract or by operation of law." R.C. 4113.15(A). In addition to requiring prompt payment, the Act allows liquidated damages to be assessed "[w]here wages remain

unpaid for thirty days beyond the regularly scheduled payday or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employee of a claim or for sixty days beyond the date of the agreement, award, or other act making wages payable and no contest[,] court order or dispute of any wage claim including the assertion of a counterclaim exists accounting for nonpayment," (Footnote omitted.) R.C. 4113.15(B). In the absence of a "contest, court order, or dispute," an employer acts as a trustee for funds after the time for payment arises. R.C. 4113.15(C).

{¶ 92} "Wages" are defined as "the net amount of money payable to an employee, including any guaranteed pay or reimbursement for expenses, less any federal, state, or local taxes withheld; any deductions made pursuant to a written agreement for the purpose of providing the employee with any fringe benefits; and any employee authorized deduction." R.C. 4113.15(D).

{¶ 93} The trial court concluded that the PPA did not apply to Brown's claims because it does not require payment of disputed wages. Decision (Oct. 18, 2021), at p. 16. The court later agreed with a case which found R.C. 4113.15 "inapplicable because it did not specifically address commissions and because a legitimate dispute existed between the parties as to the payment of the accrued unpaid commissions at termination." *Id.* at p. 17, discussing *Haines & Co. v. Stewart*, 5th Dist. Stark No. 2000CA00138, 2001 WL 166465 (Feb.5, 2001). Agreeing with this position, the trial court granted summary judgment on the PPA claim because Fukuvi disputed Brown's claims and the Offer Letter did not address commission and bonus structure.

{¶ 94} Because no payment of commission or bonuses was warranted, Brown's

argument is without merit. We do note that the better phrasing about disputed claims would be that a party may bring PPA claims even if a dispute exists over whether the wages in question are owed. However, recovery, including the right to liquidated damages, depends on whether lack of a legitimate dispute exists as to the wages in question.

{¶ 95} An employer's dispute of entitlement prevents recovery of liquidated damages. *See O'Brien v. Ed Donnelly Ents., Inc.*, 575 F.3d 567, 578 (6th Cir.2009), *partially abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016). In *O'Brien*, the court commented that "because application of the statute's safe harbor requires that there be a contest, court order, or dispute of a wage claim accounting for nonpayment, it is proper to focus on whether the asserted dispute accounts for the nonpayment. Thus, it is not the case that any recalcitrant employer can simply declare a dispute and retroactively insulate its actions." *Id.* at 578. *Accord Sutka v. Yazaki N. Am. Inc.*, 256 F.Supp.3d 677, 681 (E.D.Mich.2017).

{¶ 96} The Fifth District Court of Appeals has held that the definition of wages in R.C. 4113.15 does not include commissions. The majority opinion in *Haines* stated that "the trial court was correct in holding the definition of the word wage as used in Section 4113.15 does not include commissions, which are not guaranteed pay or reimbursement for expenses." *Haines*, 5th Dist. Stark No. 2000CA00138, 2001 WL 166465, at *3. The dissent in *Haines* agreed that "commissions are not guaranteed pay or reimbursement for expenses," but concluded that "the definition of 'wage' in R.C. 4113.15 is broader than

guaranteed pay or reimbursement of expenses." *Id.* at *4 (Hoffman, J., concurring). The Fifth District has continued to adhere to the majority position. *Bollman v. Lavery Automotive Sales & Serv., LLC*, 5th Dist. Stark No. 2019CA00025, 2019-Ohio-3879, ¶ 22. There is very little other relevant authority in Ohio on this particular point.

{¶ 97} Federal courts in the Sixth Circuit Court of Appeals have reached varying conclusions, sometimes without much analysis. *See Morgan v. Del Global Technologies Corp.*, S.D.Ohio No. 3-05-cv-123, 2007 WL 3227068, *18 (Oct. 27, 2007) (denying summary judgment to employer because material issues of fact existed concerning whether employer failed to pay employee commissions in violation of R.C. 4113.15; court did not specifically discuss whether commissions were included in wages); *Arthur J. Gallagher & Co. v. Anthony*, N.D.Ohio No. 16-cv-00284, 2016 WL 4523104, *24 (Aug. 13, 2016) (court appeared to include commissions in award for unpaid wages under R.C. 4113.15, but did not discuss whether commissions were wages). *But see Baum v. Intertek Testing Servs.*, N.D.Ohio No. 1:13-cv-1347, 2013 WL 6492372, *4 (Dec. 10, 2013) (agreeing with *Haines* that definition of wages in R.C. 4113.15(D) does not include commissions); *Jones v. Select Industries Corp.*, S.D.Ohio No. 3:04-cv-152, 2006 WL 1705201, *6 (June 6, 2006) ("referral bonuses do not qualify as 'wages' as defined by the Ohio Prompt Pay Act").

{¶ 98} We need not resolve this point however. Even if we assumed that commissions fall within the definition of wages in R.C. 4113.15(D), Brown was not entitled to payment of commissions and had no claim under the PPA.

### E. Fraudulent and Negligent Misrepresentation

**{¶ 99}** Brown's final argument under the first assignment of error is that the trial court erred in rejecting his claims for fraudulent and negligent misrepresentation because he justifiably relied on Fukuvi's misrepresentations about paying commission. Brown further contends that these claims were not time-barred because he never discovered that the promise to pay commissions was false until after he told Fukuvi that he intended to seek other employment.

**{¶ 100}** The trial court concluded that Fukuvi did not make fraudulent or negligent representations. Instead, at most, Fukuvi "indicated revisiting commissions once the company was in a better financial position, which is far from a guarantee and there is nothing fraudulent about this statement." Decision (Oct. 18, 2021), at p. 19-20. The court also concluded that these claims were time-barred because "each claim arises from an alleged modification to [Brown's] employment terms almost fifteen years ago." *Id.* at p. 20. We agree with the trial court.

**{¶ 101}** The statute of limitations for both negligent and fraudulent misrepresentation claims is four years. *E.g., Fordyce v. Hattan*, 2019-Ohio-3199, 141 N.E.3d 574, ¶ 25 (2d Dist.), citing R.C. 2305.09(C) and (D). (Other citations omitted.) "A cause of action for negligent misrepresentation accrues, and the limitations period begins to run, when the misrepresentation is made." *Id.* at ¶ 26. Although we disagree that misrepresentations occurred, we assume for purposes of argument that they occurred in December 2006 or, at the latest, at some point around June 2010, when Takagi stated he would "work" with Brown. Given these facts, Brown should have filed

suit for negligent misrepresentation by some point in either 2010 or 2014, but he did not.

**{¶ 102}** A "discovery rule" applies to fraudulent misrepresentations claims. *Id.* at ¶ 27. In that situation, "a cause of action accrues, and the limitations period begins to run, when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered the fraud." *Id.*, citing *Luburgh v. Bishop*, 2d Dist. Montgomery No. 25818, 2014-Ohio-236, ¶ 14. To decide if "the exercise of reasonable diligence should have discovered a case of fraud, the relevant inquiry is whether the facts known ' "would lead a fair and prudent [person], using ordinary care and thoughtfulness, to make further inquiry * * *." ' " *Cundall v. U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, 909 N.E.2d 1244, ¶ 29, quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 181, 465 N.E.2d 1298 (1984).

**{¶ 103}** Again, a reasonable person in Brown's position would have been well aware of the need to make further inquiry, at the latest, by June 2010. Moreover, as we pointed out earlier, Miller's comments and actions in 2012 quite clearly indicated that Fukuvi did not intend to pay past or future commissions to Brown. Despite this, Brown still waited more than seven years to file an action. Accordingly, fraudulent misrepresentation claims were time-barred as well. Given the bar to both negligent and fraudulent misrepresentation claims, we do not need to address the merits of the trial court's decision on these matters.

**{¶ 104}** Because summary judgment was properly rendered as to all of Brown's claims, the first assignment of error is overruled.

### III. Brown's Partial Motion for Summary Judgment

**{¶ 105}** In the second assignment of error, Brown states that:

The Trial Court Erred in Denying Mr. Brown's Motion for Partial Summary Judgment.

**{¶ 106}** The theory asserted in connection with this assignment of error is that Brown proved his claim for commissions, i.e., that no genuine issues of material fact exist concerning Fukuvi's breach, and the only issue left was Brown's damages. For the reasons previously discussed, this assignment of error is without merit and is overruled.

### IV. Dismissal Based on Lack of Personal Jurisdiction

**{¶ 107}** Brown's third assignment of error states as follows:

The Trial Court Erred in Granting Fukuvi Japan's Motion to Dismiss.

**{¶ 108}** Under this assignment of error, Brown argues that the trial court erred in dismissing his claims against Fukuvi-Japan because that company transacted business in Ohio concerning this case and also caused tortious injury in Ohio. Brown further contends that asserting jurisdiction over Fukuvi-Japan would be consistent with due process requirements because the company availed itself of the privilege of acting in Ohio, the case arose from the company's activities in Ohio, and personal jurisdiction over the company was reasonable.

**{¶ 109}** Because the trial court correctly granted summary judgment against Brown on all his claims, the issue of personal jurisdiction over Fukuvi-Japan need not be considered. Accordingly, the third assignment of error is overruled.

## V.   Conclusion

{¶ 110} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.

Copies sent to:

Joseph W. Borchelt
Robert W. Lotz
Karl R. Ulrich
Joshua R. Schierloh
Hon. Gerald Parker